NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0080n.06
No. 14-1090

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| In re: SETTLEMENT FACILITY DOW CORNING TRUST. | ) ) ) ) |
| | ) |
| DOW CORNING CORPORATION; DEBTOR'S REPRESENTATIVES; THE DOW CHEMICAL COMPANY; CORNING, INCORPORATED, | ) ) ) ) |
| *Interested Parties - Appellants*, | ) ) |
| v. | ) ) |
| CLAIMANTS' ADVISORY COMMITTEE; FINANCE COMMITTEE, | ) ) ) |
| *Interested Parties - Appellees*. | ) ) |

<table>
<tr><td>

**FILED**
Jan 27, 2015
DEBORAH S. HUNT, Clerk

</td></tr>
</table>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: BOGGS and COOK, Circuit Judges; and QUIST, District Judge.[*]

BOGGS, Circuit Judge. In this bankruptcy case, the bankrupt company challenges the district court's authorization of payments to lower-priority creditors, when not all higher-priority creditors have yet been paid, as contrary to the requirements of the bankruptcy plan. In 1995, Dow Corning filed for bankruptcy in response to numerous tort claims and established the Settlement Fund to pay known and future claimants between 2004 and 2019. The Settlement and Fund Distribution Agreement ("SFA") permits early payments to lower-priority creditors subject to a district-court determination that such payments would not jeopardize future payments to higher-priority creditors. The SFA Finance Committee, with the support of the Claimants'

---

[*] The Honorable Gordon J. Quist, United States District Court for the Western District of Michigan, sitting by designation.

Advisory Committee ("CAC"), requested that the district court authorize Premium Payments, a category of lower-priority payments, and the district court approved. Dow Corning and its shareholders, Dow Chemical and Corning Incorporated, appeal the district court's judgment on the ground that the court failed to follow SFA requirements. We reverse and remand.

## I.  BACKGROUND

In order to settle thousands of breast-implant-related product-liability lawsuits, Dow Corning filed for bankruptcy under Chapter 11 of the Bankruptcy Code in 1995.[1] *In re Dow Corning Corp.*, 280 F.3d 648, 653-54 (6th Cir. 2002). In 1999, the Bankruptcy Court for the Eastern District of Michigan confirmed the Amended Joint Plan of Reorganization ("Plan"), *id.* at 654, which became effective on June 1, 2004, *In re Settlement Facility Dow Corning Trust*, No. 00-00005, 2013 WL 6884990, at *1 (E.D. Mich. Dec. 31, 2013).

The Plan provides that the United States District Court for the Eastern District of Michigan will "resolve controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents." Plan § 8.7.3. The Plan provides for payments to claimants until the end of 2019, up to an aggregate cap of $2.35 billion net present value ("NPV").[2] Claimants have the option of settling through a Settlement Facility or litigating against a Litigation Facility. *Id.* § 5.4-5.4.2. A $400-million-NPV Litigation Fund is reserved for the Litigation Facility, and $1.95 billion NPV is reserved for the Settlement Fund. *Id.* § 5.3; SFA § 3.02(a). Any assets remaining in the Litigation Fund at the end of 2019 revert to Dow Corning. Litigation Facility Agreement § 8.03(b). If all settlement claimants are paid in full, the CAC is authorized to disburse all remaining assets in the Settlement Fund to approved claimants

---

[1] Unlike most bankruptcy debtors, Dow Corning was solvent when it filed and has remained so since that time. *In re Dow Corning Corp.,* 456 F.3d 668, 671 (6th Cir. 2006).

[2] Net present value (NPV) expresses all payments from 2004 to 2019 in terms of the aggregate value of such payments as of June 1, 2004. Plan § 1.102. The discount rate used for calculating NPV is 7% compounded annually. *Ibid.*

on a pro rata basis, if cost effective, or to a medical research institute or university. SFA § 10.03(b).

The Settlement Facility–Dow Corning Trust ("Settlement Facility") resolves the claims of those who settle. Plan § 1.154. The Finance Committee "is responsible for financial management of the Settlement Facility, including preparing recommendations to the District Court regarding the release of funds for payment of Claims resolved by the Settlement Facility and the Litigation Facility." *Id.* § 1.67. The CAC represents claimants' interests, and the Debtor's Representatives represent Dow Corning's interests. SFA § 4.09.

The SFA establishes four categories of payments: First Priority Payments, Settlement Fund Other Payments, Second Priority Payments, and Litigation Payments. *Id.* § 7.01(a). First Priority Payments includes all "base" payments identified in the settlement value chart that specifies the value of each type of claim. *Ibid.* Settlement Fund Other Payments include payments to certain classes of creditors and are considered a type of First Priority Payments. *Ibid.* Second Priority Payments are divided into three subcategories: (1) Premium Payments for certain classes of claimants; (2) Increased Severity Payments for certain claimants whose conditions worsen; and (3) Class 16 payments, which reimburse Dow Chemical for settlement payments made before the Plan came into effect in 2004. *Ibid.* Litigation Payments include various litigation-related expenses. *Ibid.* Premium Payments are at the heart of this dispute. They include an extra 20% payment to approved-and-paid First Priority claimants who meet certain criteria and an extra 25% payment to approved-and-paid First Priority claimants who suffered an in-body implant rupture. *Ibid.* Annex B, Settlement Grid Personal Injury Claims.

In order to distribute Second Priority Payments—including Premium Payments—before all First Priority and Litigation Payments have been made, the Finance Committee must obtain

authorization from the district court. *Id.* § 7.03(a). The court may grant authorization only after it holds a hearing and determines that "all Allowed and allowable First Priority Claims and all Allowed and allowable Litigation Payments have been paid or *that adequate provision has been made to assure such payment . . . .*" *Ibid.* (emphasis added). The SFA further notes that "[t]he parties agree that any appeal of an order of the District Court regarding the [authorization of Second Priority Payments] shall be on an abuse of discretion standard." *Ibid.*

In 2011, the Finance Committee requested that the district court authorize it to distribute 50% of historical and future Premium Payments before all First Priority and Litigation Payments have been disbursed. The Finance Committee supported its recommendation with an assessment from the SFA's Independent Assessor, Analysis Research Planning Corporation ("ARPC"). ARPC concluded that $1.981 billion NPV is available in the Settlement Fund,[3] and that it would cost $1.83 billion NPV to pay all First Priority claims, leaving $151 million NPV. The Finance Committee relied upon this assessment to estimate that a fifty-percent disbursement of historical and future Premium Payments would cost $83 million NPV, leaving a $68-million-NPV "cushion" in the Settlement Fund. The Finance Committee argued that this demonstrated adequate provision to assure payment of all First Priority Payments, and further reassured the district court that an additional $368 million in the Litigation Fund could be available to make First Priority Payments in the event such required payments exceeded the balance in the Settlement Fund. The CAC supported the Finance Committee's recommendation.

The Appellants opposed the Finance Committee's recommendation on several grounds at the payment-authorization hearing before the district court. First, they argued that the SFA

---

[3] This figure exceeds the $1.95 billion funding cap of the Settlement Fund because the Settlement Fund paid $31 million to satisfy Litigation Claims. Therefore, the "Settlement Fund [will] not be exhausted until Dow Corning [is] called upon to make Qualified Transfers of approximately $1.981 billion (i.e., $1.95 billion plus $31 million)." Appellee's Br. at 13 n.1.

4

requires that the ability to make First Priority Payments must be "virtually guaranteed" before Second Priority Payments, including Premium Payments, can be made, and that the Finance Committee did not meet this burden. In support of this argument, the Appellants submitted to the district court reports and testimony that undermined the reliability of ARPC's projections. Second, the Appellants disputed the Finance Committee's position that assets in the Litigation Fund could be counted as available when the district court assessed whether adequate provision exists to make all First Priority Payments. Finally, they contended that making Premium Payments without simultaneously making other Second Priority Payments would violate the SFA by treating same-priority creditors differently.

Interpreting the "adequate provision . . . to assure payment" language in § 7.03(a), the district court rejected the "virtually guarantee" standard proposed by the Appellants in favor of the Finance Committee's less-strict "adequate assurance" standard. The court declined to consider exhibits and expert testimony that Appellants submitted and relied upon ARPC's projection of a $68-million-NPV post-disbursement "cushion" to conclude that adequate provision has been made to assure all First Priority Payments. *In re Settlement Facility Dow Corning Trust*, 2013 WL 6884990, at *10. It also determined that the amount in the Litigation Fund and a $200 million "Time-Value Credit" are available assets for the purpose of determining whether there are sufficient funds to assure all First Priority Claims, but did not rely on those determinations in light of ARPC's projection. *Id*. at *8-9. The district court did not address whether non-Premium Second Priority Payments would have to be paid at the same time as the requested Premium Payments. Accordingly, the district court granted the Finance Committee the authority to make a fifty-percent distribution of historical and future Premium Payments. The Appellants timely appeal.

5

## II.    STANDARD OF REVIEW

SFA § 7.03(a) states that "[t]he parties agree that any appeal of an order of the District Court regarding [authorization of Second Priority Payments] shall be on an abuse of discretion standard." This provision is unenforceable because parties "cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).

The dispute in this case turns on conflicting interpretations of terms found in the Plan and the SFA. We apply principles of contract interpretation when interpreting a confirmed bankruptcy plan. *In re Dow Corning Corp.,* 456 F.3d 668, 676 (6th Cir. 2006). When reviewing a district court's interpretation of a bankruptcy plan where the district judge did not confirm the plan but has extensive knowledge of the case, we grant the district court significant deference with respect to its assessment of extrinsic evidence. *In re Settlement Facility Dow Corning Trust,* 628 F.3d 769, 772 (6th Cir. 2010). However, we evaluate de novo a district court's interpretation that does not rely on extrinsic evidence. *In re Settlement Facility Dow Corning Trust,* 517 F. App'x 368, 372 (6th Cir. 2013). As the district court did not rely upon extrinsic evidence to interpret Plan and SFA provisions, we review its interpretations de novo. New York Law governs our interpretation of the Plan and related documents. Plan § 6.13.

## III.    DISCUSSION

### A

We first review the district court's interpretation of the key requirement that it may authorize Second Priority Payments only if "adequate provision has been made to assure" that all future First Priority and Litigation Payments can be paid "based on available assets." SFA § 7.03(a). The court interpreted this to mean that the SFA requires an "adequate assurance" of

payment. The parties agree that the district court must rely on projections of the availability of funds, including the cost of making future First Priority and Litigation Payments and the cost of the requested Second Priority Payments, to determine whether making Second Priority Payments would jeopardize future First Priority and Litigation Payments. They disagree over the level of confidence that the district court must have in the projections before it may authorize Second Priority Payments.

Appellants argue that the proper standard of confidence is one of "virtual guarantee" because, under New York law, "assurance of payment" is equivalent to "guarantee of payment." Appellants' Br. at 32. The Appellee argues for interpreting SFA § 7.03(a) to mean that the court need only find that available assets provide "adequate assurance" that all higher-priority payments can be made. Appellee's Br. at 43. "Adequate assurance" is a term of art in the Bankruptcy Code that denotes the assurance of performance that a trustee must provide to assume a contract or lease after a default. 11 U.S.C. § 365(b)(1)(C). This level of assurance falls below "absolute guarantee," *In re Fine Lumber Co.,* 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008), and can mean "a strong likelihood," *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986), or "more probable than not," *In re Patriot Place, Ltd.*, 486 B.R. 773, 803-04 (Bankr. W.D. Tex. 2013).[4]

The district court adopted the Appellee's "adequate assurance" standard. *In re Settlement Facility Dow Corning Trust*, 2013 WL 6884990, at \*6 ("The Court finds that the Finance Committee's and the CAC's arguments regarding plan interpretation of the phrases at issue are the more persuasive."). Noting that the meaning of "adequate" depends upon context, *id.* at \*7,

---

[4] "Adequate assurance" is also a term of art in contract law. Under the Uniform Commercial Code, it is the assurance of performance that a contracting party can demand after discovering grounds for insecurity. U.C.C. 2-609(1). "In appropriate circumstances, a promise to perform can be an adequate assurance." *Enron Power Mktg., Inc. v. Nev. Power Co.*, 2004 WL 2290486, at \*6 (S.D.N.Y. Oct. 12, 2004).

the district court did not articulate a precise confidence level for "adequate," but ruled that a projection of a $68-million-NPV cushion meets that standard. *Id.* at *10.

The district court rejected the "virtual guarantee" standard for two reasons, neither of which we find persuasive. First, the district court found that it would frustrate SFA § 701(c)(v)'s (denominated by the district court as the "Premium Payment provision") purpose of giving "the Finance Committee the discretion to seek court approval to pay Premium Payments *contemporaneously* with the First Priority Payments if the Finance Committee is 'reasonably assured' that there are sufficient funds to distribute both payments." *Id.* at *6. The Premium Payment provision is the only portion of the SFA that contemplates the contemporaneous payment of lower- and higher-priority payments, and it states that:

> Nothing herein shall be interpreted as limiting the discretion of the Finance Committee *with the approval of the District Court* to pay lower priority payments and higher priority payments contemporaneously, so long as the ability to make timely payments of higher priority claims is reasonably assured.

SFA § 7.01(c)(v) (emphasis added). A condition precedent to this provision's applicability is district-court approval to make lower-priority payments, which could be granted only if "adequate provision has been made to assure" higher-priority payments. *Id.* §§ 7.01(c)(iv), 7.03(a). Therefore, to the extent that the Premium Payment provision has as its purpose facilitating the contemporaneous payment of Premium and higher-priority Payments, that purpose is subordinate to the district-court approval procedures and so cannot be the basis for interpreting those procedures. In sum, the "reasonably assured" language of the Premium Payment provision is applicable *only* after the CAC and the Finance Committee demonstrate that "adequate provision has been made to assure" payment of the First Priority and Litigation Payments. SFA §§ 7.01(c)(iv), 7.03(a).

8

The district court also rejected the Appellants' "virtual guarantee" interpretation because it believed that the term "'adequate provision' modifies the term 'assure,'" and that the cases Appellants cited "[did] not construe the term 'adequate provision,' but only the term 'assure.'" *In re Settlement Facility Dow Corning Trust*, 2013 WL 6884990, at *6. The district court has it backwards: the term "assure" provides context for the term "adequate provision." If a borrower tells a bank that he needs to borrow "enough money to buy a house," we would not look to the term "enough money" to find the meaning of "buy a house." The obvious inquiry would be to figure out the price for buying the house to determine how much money is enough. Similarly, the relevant inquiry here is to determine what provision would be adequate. New York law recognizes that defining "adequate provision" may be difficult because "the notion of 'adequate' is a variable one; some things are more adequate than others." *Broodstone Realty Corp.* v. *Evans,* 251 F. Supp. 58, 64 (S.D.N.Y. 1966). Fortunately, SFA § 7.03(a) makes the requisite level of adequacy clear: the provision must be so adequate as to "assure" future First Priority and Litigation Payments. We look to the word "assure" to interpret "adequate provision." The New York case cited by the parties interpret the word "assure," made in the context of making future payments, to mean guaranteeing that those payments will be made. *Utils. Eng'g Inst. v. Kofod,* 58 N.Y.S.2d 743, 744-745 (N.Y. Mun. Ct. 1945) ("It is true that the dictionary gives different meanings to the word 'assure' depending on the way it is used. . . . In the way in which the word was used here [i.e., to assure future payment], the word means 'guarantee' and all parties must have so understood it.").

Because it is impossible to account for all possible future uncertainties, we will not impose an "absolute guarantee" standard of confidence, as that would make SFA § 7.03(a) superfluous. *See Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 756 (S.D.N.Y. 2012)

9

(noting that it is a "cardinal rule that a contract should not be read to render any provision superfluous"). Accordingly, we adopt the Appellant's terminology of "virtual guarantee" to describe the required confidence standard under SFA § 7.03(a). While this standard does not require absolute certainty, it is nonetheless stricter than the "strong likelihood" or "more probable than not" levels of confidence that describe "adequate assurance."

**B**

We now turn to the question of whether the district court erred by refusing to consider the Appellants' reports and testimony. The Appellants sought to undermine ARPC's projections at the payment-authorization hearing by offering reports and expert testimony that criticize ARPC's methodologies and conclusions. The district court declined to consider these reports and testimony because "the SFA provides that the Court consider the recommendation of the Finance Committee *based on* the Independent Assessor's analysis and projections." *In re Settlement Facility Dow Corning Trust*, 2013 WL 6884990, at \*9 (emphasis added). While the Appellants are guaranteed an "opportunity to be heard with respect to the motion [to authorize the distribution of Second Priority Payments]" under SFA § 7.03(a), the district court nonetheless refused to consider their evidence because the Appellants already "had the opportunity to test and challenge the Independent Assessor's Reports throughout the years, yet no objections have been brought to the Court's attention that the Reports have been misleading or inaccurate." *Ibid.*

We first consider whether the Appellants' "opportunity to challenge the Independent Assessor's Reports *throughout the years," ibid.* (emphasis added), satisfied their contractual right to an "opportunity to be heard *with respect to the motion*," SFA § 7.03(a) (emphasis added), and conclude that it did not. In the due-process context, an "opportunity to be heard [is] an opportunity which must be granted at a meaningful time in a meaningful manner." *Armstrong v.*

10

*Manzo*, 380 U.S. 545, 552 (1965). We find this understanding of the term relevant to interpretation of SFA § 7.03(a), which concerns the proper procedures for payment-authorization hearings. It would not be a meaningful opportunity if the Appellants must voice specific objections to ARPC's projections before they know what arguments those projections were being used to support. For example, one of Appellant's experts criticized ARPC's methodology for failing to specify the level of confidence in its projections. This criticism does not allege that the projections are necessarily "misleading or inaccurate," but rather that they do not prove what they are cited as proving, i.e., high confidence in an accurate and precise projection. Because ARPC projections were used for many purposes that do not require a confidence estimate, it is understandable that the Appellants did not object to the lack of a confidence estimate in those projections until the Finance Committee's motion to disburse lower-priority payments under SFA § 7.03(a) made confidence a relevant issue. Further, the phrase "with respect to the motion" makes it clear that the Appellants' "opportunity to be heard" applies to any evidence offered at the payment-authorization hearing, even if they may have had opportunity to object in the past.

Next, we consider whether the Appellants' right to an "opportunity to be heard" includes the right to challenge ARPC's projections and conclude that it does. While the district court is correct in that it must make its decision to authorize Second Priority Payments "*based on* the Independent Assessor's analysis and projections," *In re Settlement Facility Dow Corning Trust*, 2013 WL 6884990, at *9 (emphasis added), those projections are neither immune from criticism, nor impervious to modification by the court, depending on evidence developed at the hearing. If the parties intended that the Independent Assessor's projections could not be challenged at the hearing, they could have made them determinative, rather than requiring district-court review

11

and approval. An opportunity to be heard must include the right to make methodological challenges at the relevant time. Accordingly, we reverse the district court's judgment insofar as it interpreted the SFA to grant it the discretion to ignore timely produced, otherwise admissible evidence concerning whether ARPC's projections demonstrate that "adequate provision has been made."

C

The Appellants raise several other questions that we need not resolve in order to dispose of this appeal. However, as the district court may consider these matters on remand, we note the arguments. First, the Appellants argue that the district court's asset-sufficiency analysis should consider the cost of making non-Premium Second Priority Payments—Increased Severity and Class 16 Payments—on the same basis as the requested Premium Payments. The Plan expressly requires that Class 16 Payments must be made "on the same basis and with the same priority as [other] 'Second Priority Payments' under the Settlement Facility Agreement," Plan §§ 6.16.5, 6.16.6, and the CAC concedes that "all categories of Second Priority claims *could be* paid simultaneously." Appellee's Br. at 36 (emphasis added).

Second, the Appellants challenge the district court's dicta that it can count the nearly $400 million in the Litigation Fund as available for the purpose of determining whether there are sufficient funds to assure all higher-priority payments. The SFA expressly provides that the Litigation Fund is separate from the Settlement fund and "shall be used *solely* for the payment of Litigation Payments." *Id.* § 7.01(b)(ii) (emphasis added). The only exception to this rule is that the Litigation Fund can be used, subject to district-court approval, to make First Priority Payments "[i]n the event that the Settlement Fund lacks sufficient funds in the aggregate to pay in full all First Priority Payments." *Id*. § 7.03(b).

12

Finally, Appellants dispute the district court's dicta that the Settlement Fund will be entitled to an additional $200 million. In 2013, we rejected Dow Corning's request for a $200 million (nominal) "Time-Value Credit" for early payment of $1 billion (nominal) but expressly left undecided the question of whether Dow Corning is also entitled to a net-present-value adjustment. *In re Settlement Facility Dow Corning Trust*, 517 F. App'x at 378-79. Both issues concern whether Dow Corning is overpaying, in nominal terms, its obligation to place $1.95 billion NPV into the Settlement Fund. *Id.* at 372.

## IV.   CONCLUSION

We REVERSE the district court's judgment with respect to its rulings that (1) "adequate assurance" is the proper standard for assessing the availability of funds under SFA § 7.03(a) and (2) that the SFA grants it the discretion to ignore otherwise competent reports and testimony challenging ARPC's methodologies, and we REMAND for further proceedings consistent with this opinion.